MEMORANDUM OF DECISION
On March 1, 1999, the Department of Children and Families, hereafter "DCF", filed a petition for the termination of the parental rights of Barbara E. to her biological son, Jesse E. It also filed against this child's unknown father, John Doe. The trial on the termination petition against the parents was held on February 22, 2000. The mother attended the trial and through her counsel, vigorously argued against termination. For the reasons stated below, the court grants the petition for termination of the parental rights of Barbara E. because of her failure to rehabilitate herself to be able to parent this child. The court CT Page 3518 also grants the petition as to John Doe on the grounds of abandonment. Connecticut General Statutes § 17a-112(c)(3)(A) and (B).
From the evidence presented, the court finds the following facts:
 A. FACTS 1. Barbara E, the mother.
Jesse is the oldest child born to his mother. Two younger half-siblings are in the care of their paternal relatives. While Barbara has been secretive with professionals about her background, some facts are known. She herself was neglected and abused and removed from her family several times during her minority. She was in foster care from the age of three to age seven, at which time she was returned to her father's care. When her father's second marriage ended in divorce when she was fifteen, Barbara again was placed into foster care until age seventeen. She came then to live with her former stepmother and her new husband, who apparently sexually abused her. She graduated from high school. For some years after turning eighteen, she lived elsewhere, but returned to Connecticut when she was twenty-seven. At that time, she was employed as a topless dancer in Bridgeport and came to know Jesse's father, whose name she does not know. Jesse was born on January 22, 1987 and is now thirteen years old.
She was able to keep Jesse in her care until June, 1991, when she was hospitalized because she was actively psychotic. By September 1991, she had stabilized and Jesse was able to return home to her. He was then four years old. On July 3, 1994, a daughter was born to Barbara E. and her boyfriend, Matthew P. A third child, Daniel P., the second with Matthew P. was born on June 27, 1996. In September 1996 Barbara had another acute psychotic episode while involved in providing a bone marrow transplant for Daniel, born with combined immuno-deficiency disease. She was at Duke University Medical Center for this procedure, when her behavior became increasingly bizarre. Jesse was removed from her care on September 23, 1996 and was initially placed with his maternal aunt and has been in a DCF foster home since August, 1997. He was adjudicated neglected on July 17, 1997. He has remained in foster care since that time. The two younger children were cared for by their paternal relatives and CT Page 3519 their father and are not subject to this proceeding.
At the time of her hospitalization in North Carolina, Ms. E. was diagnosed as suffering from Bi-Polar disorder, manic with psychotic features. She was also taking several medications to stabilize her, including Lithium. While at Duke, it was discovered that she had not been taking her medications as originally prescribed and, only upon careful insistence that she take them, did her condition stabilize so that she could return home.
Upon her return to Connecticut, she attended the Manchester partial-hospitalization program from October 1996 through November 1996. Expectations[2] were set for Barbara in the neglect matter concerning Jesse, which included her attendance at counseling to address her mental health issues and to take her medications as prescribed. This, the court concludes, Barbara was unable to do, primarily because she has no insight into her illness and denies that she has any difficulties. When David Mantell, the court appointed clinical psychologist, evaluated her in 1997, he noted that she "feels that she does not have a mental disorder." He found a "significant persistent mental illness" and predicted that she would experience future psychosis.
On October 2, 1998, Barbara again began to decompensate and informed the Hartford Police that her son had been murdered by his foster parents, who had eaten him. She again was treated at Manchester Memorial Hospital and discharged on November 30, 1998. At that time, she "adamantly denied that she had any need for treatment."[3] The records noted that "Barbara was taking her medications inconsistently while in treatment. It was also questionable whether or not she was taking the doses of medication that had been prescribed for her." The notes indicated that she was discharged because of her unwillingness to continue to work with her clinician or to participate in any alternate treatment plan. She also refused to accept any referrals for treatment elsewhere, "stating that she did not need to do that."
Barbara was again evaluated by Dr. Mantell in May, 1999. He concluded that "she struggles with a long term mental illness that is responsible for the confused features in her thinking and the difficult pattern of her life."[4] He testified that "her mental health problems were chronic, and very disabling to her and prevented her from parenting her children. Her denial and non-compliance with treatment had become chronic problems as well CT Page 3520 that paralleled her dysfunction." Barbara also was psychiatrically evaluated on April 21, 1999 by Dr. David A. Krulee. He concluded that her condition was:
 "far from stable. She is currently on no medication and her mental status was characterized by garrulousness, agitation, lability and only thinly veiled hostility. She exhibits poor self control and judgment to the degree that she is unable to present herself in a socially appropriate way for even a short period to time."[5]
He testified that "she was a seriously emotionally disturbed woman." He diagnosed her at the time of his examination as suffering from bi-polar disorder and concluded: "the most critical feature is not the setting [for her treatment], but her lack of insight into her illness." He found that she could not care for herself. Both he and David Mantell testified that if Barbara followed the prescribed regimen of counseling and took all required medications, it would be six months to a year before the professionals could have some level of confidence that she could sustain a stable life. In the years since her hospitalization in 1996, Barbara has not been able to sustain this and has not demonstrated any degree of compliance with the medical specialists attempting to treat her. Dr. Krulee noted during his testimony that bi-polar disorder is a very treatable disease. He noted that Barbara's "inability to understand what is wrong with her" was not specific to her diagnosis, and that there may be a variety of reasons for her lack of insight.
The DCF social worker testified concerning Barbara's compliance with both the expectations and the specific steps set for her by the court. She stated that, with the exception of attending all visits with her son, she has not complied with the requirements set by the court. She was homeless until December 1999, moving from shelter to shelter and living with friends. There were long periods of time where the worker did not know where Barbara was. She has not attended parenting classes. She has not complied with family counseling or until recently, individual counseling. She still refuses to accept the medication the treating psychiatrist expects her to use, with the exception of a medication at night to assist with sleeping. It is apparent that her treating psychiatrist was not able to change her attitude and refusal about taking the medication he believed she needed.[6]
 2. The unknown father, John Doe.
CT Page 3521
The court notes that notice was provided to the unknown father by way of publication, as required, and the court finds such notice to have been adequate under the circumstances. In the years since Jesse's birth, no individual has come forward to claim Jesse as his. There can be no question that John Doe has, by the clear and convincing evidence, abandoned this child and the court so finds.
3. The child, Jesse E.
As previously stated, Jesse is now thirteen years old. He has been out of his mother's care since he was nine years old and has resided with his present foster parents for more than two years. He is bonded to his foster parents and has done well in their home, which now includes three other children, one adopted, one natural born child and another foster child, all younger than Jesse. His foster parents would like to adopt Jesse if he becomes available for adoption.
Jesse, like his mother, was evaluated by Dr. Mantell. Dr. Mantell testified that Jesse "had developed strong and sustaining emotional attachments to the foster family, who were providing emotional continuity in his life. He was estranged from his mother and unable to relate to her in an emotional way, even though it was clear she wanted to relate to him in that way." In his opinion, it would be in the child's best interest for a termination of parental rights to enter, because there "was no likelihood [the mother] is going to get better to be able to take on his care in the reasonably foreseeable future." Dr. Mantell concluded that Jesse found "contact [with his mother] painful and unrewarding and he wished to avoid it." Jesse, in his opinion, understood that his mother was mentally ill. "He described behavior that he recognized as ill behavior." He concluded that the child "did not see his mother as capable of caring for him." Dr. Mantell noted that Jesse possesses "an adult-like awareness of the mother's condition and has a sense of compassion for her." He noted that "Jesse is painfully aware of the chaos and loss in his life and he has a strong desire for stability and permanency." While he acknowledged that because Jesse is the oldest child and lived with his mother the longest, he would not loose his "keen memories" of her. He stated that those memories were of both "pleasurable and painful experiences." Nonetheless, this did not overcome his need for permanency now. The psychiatrist evaluator, Dr. Krulee, did not meet with Jesse. CT Page 3522 However, in his opinion, Barbara was at "severe risk of decompensation" and this would imply an "inability to care for a thirteen year old." He stated that "if Ms. E. were in the midst of a florid psychotic episode, she would not be able to care for anyone."
The social worker echoed Dr. Mantell's findings regarding Jesse's awareness of his mother's difficulties. She stated "he understands that she has a chronic mental illness." She noted that after the last incident in October 1998, Jesse said to her "she [Barbara] will probably always have incidents like this." She noted that this incident which caused the police to come to his foster home was "very scary for him." After this incident, further visitation between Jesse and his mother ended except for one visit this last Christmas. Jesse has had contact with his mother by phone. Nonetheless, the social worker testified that Jesse does not want to see his mother and that it was only at the social worker's strenuous urging that he agreed to do so during the recent holidays.
 B. ADJUDICATION 1. Reasonable Reunification Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided that this finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes § 17a-112(c)(1). The court made such findings on June 10, 1999. The court does find, from the clear and convincing evidence that reasonable reunification efforts had been made prior to the date of this finding. Such efforts were hampered by Barbara's unwillingness to take necessary medication for her mental illness and to partake in the other services required. The unknown father was not available to benefit from any services.
2. Adjudicatory Findings
A. Barbara E.
On July 17, 1997, Jesse was adjudicated a neglected child and CT Page 3523 committed to the care and custody of DCF for a period of twelve months. His commitment has been extended since that time. The court further finds, by clear and convincing evidence, that as of March 1, 1999, Barbara had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in his life. Connecticut General Statutes § 17a-112 (c)(3)(B). "Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In reMigdalia M., 6 Conn. App. 194, 203, 504 A.2d 532 (1986), see also; In re Juvenile Appeal, 1 Conn. App. 463, 477, 473 A.2d 795
(1984).
Barbara, through her counsel, argues that it is fundamentally unfair to terminate someone's parental rights because they suffer from a mental illness. If Barbara had cancer, it is claimed, we would not treat her in this fashion, but would provide support services to assist her. Additionally, she claimed that DCF had not proven parental unfitness. Because she was not an unfit parent, more time should be permitted for Barbara to assume a responsible position in Jesse's life. The court finds the cancer analogy inapposite. If Barbara were suffering from cancer and refused to engage in the medial procedures that would improve her health and assist her in regaining her child, the court would find itself in a similar position. Counsel ignores the evidence that Barbara's illness is eminently treatable, and that Barbara has been offered the means with which to provide herself with a stable mental life, but has chosen to refuse to use those means. She has, as other parents who do not suffer from mental illness, failed to rehabilitate within the statutory meaning of that term and the court does not find that her illness has prevented her from doing so.
Counsel further neglects to consider that the rehabilitation ground in the context of parental termination proceedings, unlike abandonment or other grounds, does not focus exclusively on the conduct of the parent. It also measures that conduct with reference to the child's needs, bringing into the adjudicatory phase of these proceedings some elements of the considerations normally reserved for the dispositional phase. That is to say, even if Barbara has now for a period of three months been making some progress, as her therapist stated, is this progress adequate in terms of Jesse's needs? The clear and convincing evidence is that the progress is not adequate, given the length of time this CT Page 3524 child has been in care and his particular and peculiar needs for permanency and stability.
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C.,210 Conn. 157, 1167, 554 A.2d 722 (1989), In re Hector L.,53 Conn. App. 359, 366-367, ___ A.2d ___(1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petition, the court must consider not only Barbara's conduct prior to the filing of that petition, but also her conduct after that time. In this case, this was a period of slightly less than one year, during which time Barbara has only made some progress in the last three months and still refuses to consider the medication, which would provide her with the stability she needs to parent any child.
Our Appellate and Supreme Courts have clearly stated that mental illness alone is not grounds for removal of one's children and termination of one's parental rights. However:
 "the parent's rights are not absolute. Our Supreme Court has held that a parent's rights can be terminated because of her mental condition, even if she is not at fault. In weighing the interests of the child against the hardship imposed on the parent, the legislature may properly strike a balance at a point where the mental or physical deficiencies, even though involving no fault, is so great as to render the parent incapable of measuring up to the child's needs." (Internal citations and quotations omitted.) In re Antony B., 54 Conn. App. 463, ___ A.2d ___ (1999)
The court has further noted that: "Termination has consistently been recognized as being in the best interest of the child when a parent has a mental deficiency or illness which renders her unable to provide the child with necessary care." In re NicolinaT., 9 Conn. App. 598, 605, 520 A.2d 639 (1987). In re Eden F. as cited by the respondent mother does not compel a different conclusion.
B. John Doe, the unknown father.
The court has previously found, by clear and convincing evidence, that as of March 1, 1999, John Doe had abandoned Jesse. CT Page 3525 "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 14, 438 A.2d 801 (1981). The unknown father was never involved in Jesse's life.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
1) Appropriate and timely services were provided by DCF to the family. The services include services to benefit Jesse as well as referrals for Barbara to deal with her mental illness. DCF also provided visitation and case management services. John Doe was not available to receive any services.
2) As previously noted, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, until the order that further efforts were not required on June 10, 1999.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations and specific steps were set for Barbara and she was not able to even minimally fulfill them. None were set for the unknown biological father.
4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. Jesse is strongly attached to his foster parents and wishes to remain with them. He has an emotional awareness of his mother and wishes her well. He has compassion for her condition, but he does not wish to live with her.
5) Finding regarding the age of the child: Jesse is thirteen years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return him to their home in the CT Page 3526 foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the court finds that Barbara E. has not made any changes in her life to accommodate the care and nurturing of this child. The unknown father has abandoned Jesse.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken many steps for many years to encourage Barbara to have a meaningful relationship with Jesse and to rehabilitate herself, which she has been unable to accomplish. Further, no such conduct is noted as to the unknown biological father.
 D. DISPOSITION
The court concludes, from the clear and convincing evidence, that there is no biological parent ready now or in the foreseeable future, who will be able to care for Jesse. The court concludes, from the clear and convincing testimony, that it is in the best interests of Jesse to be permitted to have permanency and stability in his life. Towards that end, the court concludes that it is in his best interests that his parents' rights to him be terminated. Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In reJuvenile Appeal (84-CD), 189 Conn. 276, 455 A.2d 1313 (1983). In addition, "because of the psychological effects of prolonged termination proceedings on young children, time is of the essence. . ." In re Alexander V., 25 Conn. App. 741, 748,596 A.2d 930 (1992).
The court therefore orders that a termination of parental rights enter with respect to Barbara E. and John Doe as to Jesse E. The court further appoints the Commissioner of the Department of Children and Families his statutory parent. As the foster parents have expressed a desire to adopt Jesse, the court directs that they be given first consideration in any adoption. The court further orders that a permanency plan for Jesse be submitted within sixty days. A review plan for him shall be filed in CT Page 3527 accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session
[2] Petitioner's Exhibit 4, dated 5/28/97.
[3] Petitioner's Exhibit 3, records of Manchester Memorial Hospital, page 4 — closing note.
[4] Petitioner's Exhibit 6, Psychological Report dated May 17, 1999.
[5] Petitioner's Exhibit 5, Psychiatric Evaluation dated May 11, 1999.
[6] Petitioner's Exhibitt 7, Records of Genesis Center, Manchester, CT.